UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| CHRISTOPHER HIRD, et al., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| BOSTROM SEATING, INC., | ) |
| | ) |
| Defendant/Third-Party Plaintiff, | )   CV 00-BU-2378-E |
| | ) |
| vs. | ) |
| | ) |
| FORTIS BENEFITS INSURANCE COMPANY. | ) |
| | ) |
| Third-Party Defendant. | ) |

ENTERED

JUN 0 7 2001

## MEMORANDUM OPINION

This case is presently before the Court on motions for summary judgment filed by Fortis Benefits, Inc. [Fortis], asking the Court to dismiss Plaintiffs' claims against it (Doc. 74) and to dismiss claims of Bostrom Seating, Inc. against it (Doc. 76). Plaintiffs have filed their opposition to Fortis's motion; Bostrom did not file anything in opposition to Fortis's motion.

The Court has reviewed the parties' submissions and, for the reasons set forth below, the Court finds that there are no disputed issues of material fact and that

Fortis is entitled to judgment as a matter of law on Plaintiff's claims and Bostrom's third-party claim.

## I.    SUMMARY JUDGMENT STANDARD

On a motion for summary judgment, the court assesses all of the proof the parties can bring to bear in order to ascertain whether a genuine need for trial is present. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986). Summary judgment is weighed heavily in favor of the non-movant; it is appropriate only if the court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). A party seeking summary judgment has the initial responsibility of informing the Court of the grounds for its motion and specifically identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323; 106 S. Ct. at 2553; *see also Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its initial burden, the nonmoving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." *Howard v. BP Oil Company*, 32 F.3d 520, 523 (11th Cir. 1994). In

resolving whether a given factual dispute requires submission to a jury, a district court must view the record in the light most favorable to the nonmoving party and resolve all reasonable inferences in the nonmovant's favor. *Rooney v. Watson*, 101 F.3d 1378, 1380 (11th Cir. 1996) (citing *Hale v. Tallapoosa Co.*, 50 F.3d 1579, 1581 (11th Cir. 1995)).

## II.  **STATEMENT OF FACTS**

Effective January 1, 1992, Bostrom entered into a group term life insurance, accidental death, and dismemberment insurance program with Fortis as part of an employee welfare benefit plan established for the benefit of Bostrom's employees in accordance with the Employee Retirement Income Security Act [ERISA], 29 U.S.C. § 1001, et seq.

The Fortis program provided two forms of life insurance – non-contributory life insurance and contributory life insurance.  Non-contributory insurance was provided by Bostrom at no cost to the employee.  Additional contributory insurance could be purchased by Bostrom's employees at group rates.  Under the terms of the policy, the amount of insurance available for non-contributory life depended upon the classification of the employee.  There were five classes of eligible employees. Salaried full-time employees were entitled to receive 100% of their annual pay subject to a maximum amount of $150,000.00.  At the time of retirement, the employee retained only $10,000.00 in non-contributory life insurance.

Full-time employees who were salaried and who had not reached age 65 could elect to receive contributory insurance in an amount not to exceed 200% of the covered person's annual pay and subject to a maximum of $300,000.00.

The contract of insurance between Bostrom and Fortis Benefits provides as follows, in relevant part:

## ELIGIBILITY AND TERMINATION PROVISIONS

**Eligible Persons**

To be eligible for insurance, a person must:

- be a member of an *eligible class*;[1]
- complete any Service Requirement shown in the Schedule by continuous service with the employer, the *policyholder*, or an *associated company*; and
- give us *proof of good health*, if required.

. . .

**When a Person's Insurance Ends**

A *covered person's* insurance will end on the date:

- the *policy* ends;
- the *policy* is changed to end the insurance for a persons' *eligible class*;
- a person is no longer in an *eligible class*;
- a person stops *active work*;[2] or
- a required contribution was not paid.

---

[1]"Eligible class" is defined in the policy as "a class of persons eligible for insurance under the *policy*. This class is based on employment or membership in a group." Doc. 78, Exh. 1, p. FOR-202.

[2]"Active work" is defined in the policy as "working *full-time* for the *policyholder* . . . at your usual place or business." Doc. 78, Exh. 1, p. FOR-202.

Doc. 78, Exh. 1, pp. FOR-210-11.

The summary of the policy provides, "The *policy* includes a conversion privilege. If any amount of a person's life insurance ends, it may be possible to convert all or a part of it to a *conversion policy*[3] with no health exam." Doc. 78, Exh. 1, FOR-205. The particular provision of the policy regarding the conversion policy states:

> If any of your group *life insurance* ends, you can apply for any individual policy offered by us (conversion policy). You must apply and pay the premiums within 31 days. The individual policy may be any we offer for conversion. No *proof of good health* is required. The amount of insurance available to you depends on the reason your insurance ends.
>
> If your insurance ends because you are no longer eligible or because of a change in age or other status, you may convert the full amount that ended.

Doc. 78, Exh. 1, p. FOR-215.

The policy provides that Fortis, the administrator of the Plan, had authority to interpret the terms of the Plan.

Fortis Benefits interprets these provisions to mean that, under the terms of the Bostrom Plan, when an employee, such as Mr. Hird, retires then he is no longer considered a member of an eligible class and his contributory life insurance ends on that date. In such cases, Fortis Benefits interprets the Plan to require the retiree to

---

[3]"Conversion policy" is defined in the policy as "a policy of individual life insurance which may be issued to you by us when part or all of your group *life insurance* ends, as described in the Conversion to an Individual Policy" provision." Doc. 78, Exh. 1, p. FOR-203.

convert the group coverage to an individual life insurance policy. Under the terms of the Bostrom Plan, Fortis Benefits is unable to pay benefits without receiving a conversion application.

The policy also contains the following provision regarding "errors":

> An error in keeping records will not cancel insurance that should continue nor continue insurance that should end. We will adjust the premium, if necessary, but not beyond 3 years before the date the error was found. If the premium was overpaid, we will refund the difference. If the premium was underpaid, the difference must be paid to us.

Doc. 78, Exh. 1, p. FOR-227.

Fortis interprets this provision to mean that, under the terms of the Bostrom Plan, "it makes accounts allowances for bookkeeping errors whether a person should have been on the employer list, or should not have been. And would appropriately make premium adjustments or insurance adjustments." Doc. 78, Exh. 4, pp. 274-75. Stated differently, Fortis interprets this provision as providing it leeway to make adjustments for accounting, bookkeeping, and "common paperwork" errors. However, it does not interpret this provision to allow for an individual to obtain life insurance after ceasing employment without submitting a conversion application, even if the failure to file such an application was an error.

Bostrom employees are not given copies of the insurance policy. There is no evidence that Mr. Hird ever received a copy of the group policy, or a summary plan, or that he was told of the requirements for converting the policy from the group life

policy to an individual contributory life policy. In her deposition, Bostrom Human Resources employee, Tammy Porter, testified as follows:

Q.   All right. Did Fortis -- did you have from Fortis available in the Human Resources Department copies of the group policies to give to employees --

A.   No, sir.

Q.   -- if they asked?

A.   No, sir. And I did have employees ask.

Q.   What would you tell them to do if they wanted a policy?

A.   I just told them that we did not have individual policies to give out.

Q.   All right. Did you all have certificates to give out, as far as any particular life insurance coverage? And I'm really talking about from when you got there until Mr. Hird did. Did y'all have a certificate form that you could give to an employee to verify whatever coverage they had?

A.   I think so.

Q.   All right. Where would you all get those things from, those certificates?

A.   That's something that Amanda handled. I don't know if she gave those out, but we got little card things in the mail, I think.

Q.   From Fortis?

A.   Yes, sir.

Q.   And they would rely on you all to actually hand them out?
A.   Yes, sir. To the best of my knowledge.

Doc. 78, Exh.3, pp. 25-27.

The contract of insurance between Fortis Benefits and Bostrom provides as follows, in relevant part:

> **Agency.**   Neither the policyholder, any employer, any associated company, nor any administrator by the foregoing is our agent.  We are not liable for any of their acts or omissions.

Doc. 78, Exh. 1, p. FOR-227.

During her deposition, a former Bostrom employee Rhonda Scott described the relationship between Fortis Benefits and Bostrom as follows:

> Q.   Okay.  Have you ever been an employee of Fortis?
>
> A.   No, sir.
>
> Q.   Have you ever received a paycheck from Fortis?
>
> A.   No, sir.
>
> Q.   Okay.  While you were working at Bostrom, did they have any control over how you performed your job?
>
> A.   Did Fortis have --
>
> Q.   Did Fortis?
>
> A.   -- have control?  No, sir.
>
> Q.   Okay.  Did Fortis have the authority to fire you --
>
> A.   No, sir.
>
> Q.   -- while you were at Bostrom?
>
> A.   No, sir.
>
> Q.   Okay.  And Fortis didn't have any say-so in whether to hire you or not either; correct?

A.    No, sir.

Doc. 78, Exh. 6, pp. 77-78.

On July 1, 1963, Mr. Hird began his employment with Bostrom.  Over the years of his service Mr. Hird earned several benefits from Bostrom and, on August 20, 1991, the President of Bostrom sent a memo to Mr. Hird explaining a change in Bostrom's retirement policy.  One of the changes addressed by Bostrom's memo was a provision that employees with fifteen years or more of service are eligible for early retirement after they reach the age of sixty-two years.  Prior to this change, employees were able to retire at age fifty-five.  The memo also explained to the employees that Bostrom's own internal retirement policy requires that the group life insurance coverage at issue in this case ceases at retirement and must be converted.

Pursuant to Bostrom's wishes to keep the policy consistent with its internal retirement guidelines, Fortis Benefits included a provision in the Bostrom Plan which provides non-contributory life insurance benefits to employees with fifteen years or more of service that retire after age sixty-two.

On September 29, 1993, Mr. Hird entered into an agreement with Bostrom relating to his separation from employment with Bostrom.  In the agreement, Bostrom agreed that Mr. Hird's full-time employment would terminate effective October 2, 1993.  The agreement between Bostrom and Mr. Hird provided that Mr. Hird was entitled to receive the following benefits:

1.   A salary of $5,000.00 per month through February 14, 1996, representing accumulated vacation pay not yet taken;

2.   From October 2, 1993 until February 14, 1996, Mr. Hird was entitled to "all benefits" Mr. Hird would have been entitled to receive had he been actively employed; and

3.   Upon completion of the continuation period through February 14, 1996, Mr. Hird would be eligible for "early retirement" from Bostrom and, at that time, he would qualify for and be eligible "for any and all benefits offered to retirees of Bostrom at age 62, in the same manner and to the same extent that he would have been qualified and eligible had he attained age 62 while actively employed by Bostrom."

Doc. 78, Exh. 9.

At the time Fortis began providing insurance to Bostrom, they agreed to "grandfather in" Mr. Hird and certain other persons in the insurance program. Significantly, Mr. Hird's eligibility for life insurance benefits was created apart from the general policy provisions through an endorsement to the policy that listed Charles Hird as a separate "covered person" with $160,000.00 of contributory life insurance.   Neither the endorsement nor the policy states whether the "grandfathered" insureds were subject to the general policy provisions governing the ending of coverage.  However, the policy states:

Each employee who

. . .
will be covered by us and be provided the life insurance benefits for which he or she and his or her dependents, if any, were eligible under the prior plan until the earlier of

. . .

the date his or her *life insurance* coverage would otherwise have
terminated according to our individual termination of coverage
provisions (for example, the date of termination of employment or the
dependent ceases to be an eligible dependent.

Doc. 78, Exh. 1, p. FOR-197.

Ms. Porter informed Mr. Hird that all he needed to do to continue life insurance

coverage at $120,000.00 was begin paying $57.60 every two weeks.  During her

deposition, Ms. Porter admitted that she gave this inaccurate information to Mr. Hird

without referencing the policy which was in Bostrom's offices.  She also testified that

she did not call anyone at Fortis to ask what the correct answer was to Mr. Hird's

question or to get approval from Fortis Benefits to make that representation.

Bostrom never informed Fortis of Mr. Hird's retirement (the 1993 or the 1996 date),

rather Bostrom simply forwarded the premiums to Fortis Benefits without any

indication that Mr. Hird's employment status had changed.

Mr. Hird was carried on the rolls of Bostrom as an "employee" from November

2, 1993, until his 62nd birthday on February 14, 1996.  At some point, Mr. Hird

reduced the amount of additional contributory life insurance from $160,000.00 to

$120,000.00.

On June 2, 1994, Mr. Hird was notified by Rhonda Scott, a Bostrom employee,

as follows:

In a review of our records, I notice that your [contributory] life insurance
premium should have increased when you turned 60 years old.  You
currently pay $36.00 biweekly and are signed up for $120,000.00 worth
of coverage.  Your biweekly premium for $120,000.00 should be

$76.80.  Before I make the change, I want to verify that you wish to maintain $120,000.00 level of coverage.  Please let me know if you want the increased premium or if you want to decrease your coverage. Feel free to call if you have any questions.

Doc. 83, Exh. 5, exh. 12.

Mr. Hird notified Ms. Scott on June 9, 1994 that he wanted to retain the $120,000.00 in supplementary life insurance. Fortis' insurance records for 1994 and 1995 confirm that Mr. Hird was carrying $120,000.00 in additional contributory life insurance.

On September 27, 1996, Tammy Porter with Bostrom wrote Mr. Hird the following letter:

Also, I wanted to remind you that you are eligible to continue your life insurance at the amount you had before you retired ($120,000.00). Your premium for this will continue to be $57.60 every two weeks or $115.20 per month.  After you reach 65 years of age, the maximum amount available drops to $10,000.00.  Your premium would be $2.60 per month.  Please contact me as soon as possible if you wish to continue life insurance coverage.

Doc. 83, Exh. 3, exh. 17.

On October 7, 1996, Mr. Hird talked with Ms. Porter by telephone and confirmed that he wanted to continue the $120,000.00 life insurance.  He enclosed his check for the amount of the premium for the three months from October through December of 1996.  A Bostrom employee confirmed in writing that Bostrom had or would pay Mr. Hird's premium from March through September  of 1996.

Thereafter, Mr. Hird continued to correspond with Bostrom and continued to pay the premium quoted by Bostrom. Indeed, prior to Mr. Hird's death, he had pre-paid the premium up to February 14, 1999. Fortis continued to bill Bostrom for $120,000.00 in contributory life insurance benefits.

In June 1998, Ms. Porter advised Fortis (for the first time) that Mr. Hird had retired in 1996. At the request of Bostrom, Mr. Hird was then put back on Fortis's bill to Bostrom for $120,000.00 in coverage at group rates.

On August 25, 1998, Mr. Hird died. The following day, Bostrom employees Wanda Donovan and Tammy Porter had a lengthy telephone conversation with Fortis employees concerning Mr. Hird's life insurance. Prior to Mr. Hird's death, Mr. Hird's $120,000.00 supplemental life coverage had been discontinued on Fortis' roles and his non-contributory life coverage in the amount of $72,000.00 had been substituted, as a result of Bostrom's errors. Fortis continued to accept Mr. Hird's premium. Bostrom continued to submit Mr. Hird's name on its list of individuals entitled to coverage even after Mr. Hird's death.

A claim for life insurance benefits was made by Ms. Porter on behalf of the Hirds on or about January 14, 1999. The claim form made request for payment of $120,000.00 in contributory life insurance benefits and $72,000.00 in non-contributory benefits.

Question 7 on the form asking "Date insured ceased working usual number of hours per week" was left blank. The claim form provided that Mr. Hird passed

away on August 25, 1998, and that $120,000 of contributory life insurance benefits and $72,000 of non-contributory life insurance benefits were being requested. After several requests to Bostrom by Fortis Benefits to determine the exact date of retirement, Bostrom eventually represented to Fortis Benefits that Mr. Hird retired on February 14, 1996, his sixty-second birthday.

In April of 1999, Fortis decided to pay $72,000.00 in non-contributory life insurance benefits but denied the $120,000.00 claim. Fortis refunded to Mr Hird's beneficiaries the amount of premiums paid for the contributory life insurance -- $1,684.80 -- on July 21, 1998.

As to the contributory life insurance benefit, on April 27, 1999, Terri Steen sent a letter to Ms. Porter reminding her of the applicable policy provisions and informing her that:

> The information in our file indicates that Mr. Hird retired sometime prior to February of 1996. Based on this information he no longer was considered a member of Class I. Class I is defined as each *active, full-time* employee of the *policyholder* or an *associated company* . . . . Mr. Hird's Additional Contributory life insurance would have ended on that date. He would have had 31 days in which to convert this to an individual policy. Since this was not done, we find that we are unable to pay this claim.
>
> If you have any questions or if you believe there is additional information that may not have been considered in the review of this claim, please let us know.
>
> We have forwarded to the claimants a statement of the Fortis Benefits Denial Review Procedure with a copy of this letter attached. This will represent the claimant's notification of denial as well as the applicable

claim denial review procedure in the event the claimant wishes to appeal this decision.

Doc. 78, Exh. 1, p. FOR-354.

On June 21, 1999, the attorney for the Hirds wrote a letter invoking Fortis' administrative appeal process. In this letter, the Hirds' attorney made it clear that Mr. Hird had applied for continuation coverage and had paid the premium he was told to pay. On July 2, 1999, Fortis Benefits sent a letter to plaintiffs' former attorney acknowledging receipt of his appeal request and enclosing a copy of the denial procedure. Fortis Benefits also included a conversion application in this correspondence showing that a "[sixty-two] year old male would pay $7,459.60 per year for an individual life insurance policy in the amount of $120,000." Doc. 78, Exh. 1, p. FOR-327.

However, on July 28, 1999, Fortis again denied the claim because Mr. Hird had not filed a conversion application and paid the premium due on a converted policy. The letter included quotations of the applicable provisions of the policy, and the following:

> I have enclosed a copy of the original application for coverage, along with a copy of an interoffice memo sent to employees of [Bostrom] Seating, explaining the retirement policy.

> It is my understanding that Ms. Porter is working with our premium collection department to determine the proper refund. According to our records, we have refunded $1684.80 to [Bostrom] Seating for Mr. Hird's coverage, to date. I have enclosed a copy of the billing statement, reflecting this refund to [Bostrom] Seating.

> We believe that we have paid all of the benefits available on the life of
> Charles Hird. We regret that we are unable to provide a more favorable
> response to your appeal.
>
> At this time, a further level of administrative appeal is available to you.
> Should you wish to submit further evidence in support of your appeal,
> please do so. A copy of the appeal procedure is also enclosed.

Doc. 78, Exh. 1, p. FOR-264-65.

On August 5, 1999, the Hirds' attorneys wrote Ms. Porter of Bostrom requesting that Bostrom pay the claim since Fortis was taking the position that it was Bostrom's fault that the proper procedures had not been followed to secure the converted policy. This request was denied.

On August 26, 1999, in response to a request by plaintiffs' former attorney, Fortis Benefits sent a memo explaining how the payment of $72,000 was determined.

On September 23, 1999, the Hirds' attorneys again wrote Fortis and requested a reconsideration of the denial of the claim. On September 29, 1999, Fortis acknowledged receipt of the request for reconsideration and forwarded the claim to Denise Fussell, Manager of Claims. Thereafter, on October 5, 1999, Fortis again denied the claim. Fortis admits the Hirds exhausted all administrative remedies.

Plaintiffs, the children and beneficiaries of Mr. Hird, originally filed this civil action against Bostrom in a Wisconsin state court. Plaintiffs claimed they were entitled to life insurance benefits because of erroneous instructions given to Mr. Hird

by one or more Bostrom employees relating to the contributory life insurance benefit available to him under the Plan.  Fortis was not a party to this lawsuit.

Bostrom removed the case to federal court and had it transferred to the Northern District of Alabama.  Thereafter, Bostrom filed a third-party complaint against Fortis alleging that Fortis should be responsible for paying if Bostrom is found liable for the unpaid insurance benefits on the ground that "[Bostrom] is not a life insurance company nor is it licensed or authorized to sell life insurance policies."  Doc. 12, ¶ 4.  Bostrom does not allege in its third-party complaint that Fortis violated any laws in regard to the issuance or administration of the group life insurance policy.

On October 24, 2000, Fortis moved to dismiss the third-party complaint on the grounds that the claims alleged against it are preempted by ERISA.  On November 17, 2000, the Court issued an Order denying Fortis's motions without prejudice to refile.  In this same document, the Court also ordered Plaintiffs and Bostrom "to allege, in the alternative, any ERISA claim that they may have against [Fortis]."  Doc. 34.

On December 1, 2000, Plaintiffs complied with the Court's Order and filed a second amended complaint and a third amended complaint, which (1) realleged the counts of the original complaint and the first amended complaint, (2) alleging an ERISA cause of action against Fortis, (3) alleging a breach of fiduciary duty claim,

and (4) alleging a claim for bad faith against Fortis. Bostrom did not allege an alternative claim under ERISA against Fortis.

## III. <u>DISCUSSION</u>

### A. ERISA CLAIMS

The Court finds that Plaintiffs' claims for benefits and their claims alleging breach of fiduciary duties are within the scope of ERISA. *See Glass v. United of Omaha Life Insurance Co.,* 33 F.3d 1341, 134* (11th Cir. 1996)

#### 1. FAILURE TO PAY BENEFITS

##### a. Arbitrary and Capricious

The standard of review in an ERISA case challenging the denial of benefits based on plan interpretations has been stated by the Eleventh Circuit Court of Appeals as follows:

> A review under the arbitrary and capricious standard is appropriate where the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. However, if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion. The beneficiary need only show that the fiduciary allowed himself to be placed in a position where his personal interest might conflict with the interest of the beneficiary. A conflicted fiduciary may favor, consciously or unconsciously, its interests over the interests of the plan beneficiaries. The standard of review for a fiduciary operating under a conflict of interest remains arbitrary and capricious with a significantly diminished degree of deference. Although even a conflicted fiduciary should receive deference when it demonstrates that it is exercising discretion among choices which reasonably may be considered to be in the interests of the participants and beneficiaries, the burden shifts to the fiduciary to prove that its interpretation of plan

> provisions committed to its discretion was not tainted by self-interest. If the fiduciary succeeds in proving this burden, the opposing party may still succeed if the action is arbitrary and capricious by other measures.

*Adams v. Thiokol Corp.*, 231 F.3d 837, 842 (11th Cir. 2000) (internal quotations and citations omitted).

Plaintiffs contend that "Fortis has a conflict of interest in this case;" however, they have offered no evidence of such a conflict. Doc. 82, p. 32. Nevertheless, the Court assumes, without deciding, that such a conflict exists and the heightened standard applies.

"Under the heightened standard, [the Court] must first determine the legally correct interpretation of the disputed plan provision.  If the administrator's interpretation was legally correct, the inquiry ends.  If the administrator's interpretation differs, we must then determine whether the administrator was arbitrary and capricious in employing a different interpretation." *Id.* at 843 (citing *Collins v. American Cast Iron Pipe Co.*, 105 F.3d 1368, 1370 (11th Cir.1997); *Brown v. Blue Cross and Blue Shield*, 898 F.2d 1556, 1570 (11th Cir. 1990), *cert. denied*, 498 U.S. 1040, 111 S. Ct. 712, 112 L. Ed. 2d 701 (1991); *Newell v. Prudential Insurance Co.*, 904 F.2d 644, 651 (11th Cir. 1990)); *see also Brown*, 898 F.2d at 1566 n.12 ("It is fundamental that the fiduciary's interpretation first must be 'wrong' from the perspective of de novo review before a reviewing court is concerned with the self-interest of the fiduciary.").

The unambiguous terms of the policy at issue require Plan participants to apply for a conversion policy when a Plan participant retires in order to continue coverage.  Mr. Hird did not apply for a conversion policy after he retired.  Therefore, Fortis's decision to deny Plaintiffs' claim for benefits, for which Mr. Hird was not eligible, was "legally correct."

Plaintiffs are not entitled to payment of benefits under the contributory life policy.  However, the Court makes no finding at this time whether Mr. Hird's failure to apply for a conversion policy was his fault or that of Bostrom.

### b.    Estoppel

Plaintiffs contend that Fortis is not entitled to a summary judgment on their claim for benefits because Fortis is estopped to deny benefits because Bostrom, acting as Fortis's agent, misled Mr. Hird.

The Eleventh Circuit Court of Appeals has held that estoppel claims under ERISA are limited:

> In the Eleventh Circuit we have created a very narrow common law doctrine under ERISA for equitable estoppel when (1) the provisions of the plan at issue are ambiguous, and (2) representations are made which constitute an oral interpretation of the ambiguity.  *See Kane v. Aetna Life Ins.*, 893 F.2d 1283, 1285-86 (11th Cir.1990).  However, estoppel is not available either for oral modifications (as opposed to interpretations) or when the written plan is unambiguous.  See *Alday v. Container Corp.*, 906 F.2d 660, 666 (11th Cir.1990); *Nachwalter v. Christie*, 805 F.2d 956, 960 (11th Cir.1986).

*Glass v. United of Omaha Life Insurance Co.*, 33 F.3d 1341, 1346 (11th Cir. 1996).

The written plan in this case is unambiguous.  Therefore, Fortis is entitled to judgment in its favor as to Plaintiffs' estoppel claim.

### c.    Waiver

Plaintiffs contend that Fortis accepted Mr. Hird's premiums with knowledge that Mr. Hird had retired and that he had not applied for a conversion policy. Therefore, they argue that Fortis waived the condition of a conversion  application.

This Circuit has recognized that the doctrine of waiver may apply in an ERISA claim for benefits upon a showing of one of two circumstances:  (1) an "intentional relinquishment of a known right" by the insurer,  or (2) "any unjust benefit circumstance".  *Glass*, 33 F.3d at 1347-48 (citing *Thomason v. Aetna Life Insurance Co.*, 9 F.3d 645 (7th Cir.1993); *Pitts by and Through Pitts v. American Security Life Ins. Co.*, 931 F.2d 351 (5th Cir.1991)); *see also Burger v. Life Ins. Co. of North America*, 103 F. Supp. 2d 1344, 1348-49 (N.D. Ga. 2000); *Variety Children's Hosp., Inc. v. Blue Cross/Blue Shield of Florida*, 942 F. Supp. 562, 570-71 (S. D. Fla. 1996).

The record before the Court fails to show sufficient evidence from which a reasonable jury could find that Fortis intentionally waived the conversion application requirement and/or that it received an unjust benefit.  Therefore, the Court finds that there are no disputed issues of material fact with regard to Plaintiffs' waiver claim and that Fortis is entitled to judgment as a matter of law on that claim.

### 2.    CO-FIDUCIARY LIABILITY

Plaintiffs contend that Fortis is liable for the conduct of Bostrom under the co-fiduciary provision of ERISA.  Doc. 82, p. 20 (citing 29 U.S.C. § 1105(a).

Section 405(a), codified as 29 U.S.C. § 1105(a), provides as follows:

In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
>
> (2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

29 U.S.C. § 1105(a).[4]

_____

[4]Section 1104(a)(1) provides:

Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and--

(A) for the exclusive purpose of:

> (i) providing benefits to participants and their beneficiaries; and
>
> (ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the
(continued...)

Plaintiffs contend that "Fortis failed to properly train Bostrom concerning its disclosure obligations and failed to make sure Bostrom was conversant with all plan provisions, definitions and procedures." Doc. 82, p. 21. The breach of these duties, Plaintiffs contend, gives rise to liability for Bostrom's breach pursuant to § 1105 (a)(2) & (3). The Court disagrees.

There is no indication that Fortis was aware of Bostrom's lack of knowledge and expertise regarding the Plan (and, indeed, Bostrom's own internal retirement policies) within 31 days of Mr. Hird's retirement, the time within which Mr. Hird was required to apply for a conversion policy. Moreover, Plaintiffs have not demonstrated that Fortis had a fiduciary duty to train and supervise Bostrom, another fiduciary, in the performance of its duties.

Therefore, the Court finds that Plaintiffs cannot establish, pursuant to 29 U.S.C. § 1105(a)(2) or (3), that Fortis is liable for Bostrom's alleged breach of fiduciary duty. *See Willett v. Blue Cross and Blue Shield of Alabama*, 953 F.2d

---

[4](...continued)

circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

(C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter.

1335, 1341-42 (11th Cir. 1992); *Justice v. Bankers Trust Co.*, 607 F. Supp. 527, 536 (N.D. Ala. 1985)

### B.    STATE LAW CLAIMS

#### 1.    Plaintiffs' Bad Faith Claim

Fortis argues that Plaintiffs' bad faith claim is preempted by ERISA.  However, this Court has held that such claims are not preempted. *See  Salter v. United Health Care of Alabama, Inc.*, CV 01-BU-0800-S, Doc. 2 (N.D. Ala. Apr. 4, 2001)("The Court finds that this matter is due to be remanded on the authority of *Hill v. Blue Cross Blue Shield of Alabama*, 117 F. Supp. 2d 1209 (N.D. Ala. 2000),*appeal dismissed,* No. 00-16128-JJ (11th Cir. Mar. 27, 2001), which held that bad faith claims were not preempted by ERISA.").

Nevertheless, because the Court finds that Plaintiffs are not entitled to a payment of benefits pursuant to the life insurance contract at issue, Fortis is entitled to judgment as a matter law on Plaintiffs' claim that Fortis -- in bad faith -- failed to pay such benefits. *See State Farm Fire & Cas. Co. v. Slade*, 747 So.2d 293, 318 (Ala. 1999).

#### 2.    Bostrom's Claim for Indemnity

Fortis filed a motion for summary judgment as to Bostrom's third-party complaint against it.  Bostrom does not oppose Fortis's motion.

Based on the Court's review of the record, there are no disputed issues of material fact and Fortis is entitled to judgment as a matter of law as to Bostrom's third-party complaint.

## IV.   **CONCLUSION**

Based on the foregoing, Fortis's motions for summary judgment (Docs. 74 and 76) are due to be granted. The Court finds no disputed issues of material fact and that Fortis is entitled to judgment as a matter of law with regard to Plaintiffs' claims against it and with regard to Bostrom's claims against it.

The Court will enter an Order contemporaneously herewith in accordance with this Memorandum Opinion granting summary judgment in favor of Third-party Defendant Fortis on all claims of Plaintiffs and Bostrom's Third-party claims.

DONE this _____ day of June, 2001.

_____
H. DEAN BUTTRAM, JR.
UNITED STATES DISTRICT JUDGE